The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

HADIS NUHANOVIC,

Defendant.

NO. CR20-151RAJ

**SUPERSEDING INFORMATION**

The United States Attorney charges that:

## **INTRODUCTION**

1.      Amazon.com, Inc. is a Seattle-based company that operates the Amazon Marketplace, one of world's largest online marketplaces. The Amazon Marketplace is an electronic commerce (or "e-commerce") digital platform, on which consumers can purchase goods, multimedia, and services, from online merchants. The merchants who make sales on the Amazon Marketplace include Amazon itself and "third-party" or "3P" sellers, the latter of which are non-Amazon individuals and entities.

2.      Since at least 2017, the Defendants (that is, HADIS NUHANOVIC and the other defendants named in the Indictment in this case), and others known and unknown to the Grand Jury, have conspired to pay, and have paid, over $150,000 in commercial bribes to complicit Amazon employees and contractors (collectively referred to herein as

Superseding Information - 1
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  "Amazon insiders").  In exchange for bribes, and the promise of such bribes, the Amazon

2  insiders baselessly and fraudulently conferred tens of millions of dollars of competitive

3  benefits upon hundreds of 3P seller accounts that the Defendants purported to represent

4  in their capacity as prominent "consultants" to 3P sellers.  Through this scheme, the

5  Defendants intended to cause harm to Amazon, and to 3P sellers and consumers on the

6  Amazon Marketplace, including by depriving Amazon of the exclusive use and

7  confidentiality of its internal business information, interfering with Amazon's ability to

8  ensure the safety and authenticity of goods sold on the Amazon Marketplace, and

9  impairing consumers' access to accurate, reliable information about merchants and

10  products on the Amazon Marketplace.

11        3.        The Defendants are members of an interdependent community of 3P

12  sellers, consultants to 3P sellers, and Amazon insiders who have accessed and coopted,

13  without authorization and for private financial gain, the computer systems, processes, and

14  information that regulate day-to-day operations of the Amazon Marketplace.  Through

15  the use of bribes, and the promise of bribes, the Defendants, and Amazon insiders,

16  engaged in the following conduct, among other conduct:

17        a.        **Stealing Amazon confidential business information**:  Defendants,

18  and other 3P sellers and consultants, bribed Amazon insiders to send them confidential

19  information that the insiders misappropriated from Amazon's protected networks,

20  including a trove of internal standard operating procedures (SOPs) and Wikis.  The stolen

21  files included, among other things, the formulae for the algorithms that power the

22  Amazon Marketplace search engine, Amazon's product-review rankings, and the coveted

23  "buy boxes" that list default sellers on particular product listings; the criteria that

24  Amazon considers when determining whether to suspend or reinstate accounts or product

25  listings; Amazon's internal notes (or "annotations") about hundreds of 3P accounts; and

26  thousands of consumers' and employees' identities and contact information.  The

27  Defendants, and other 3P sellers and consultants, derived substantial commercial benefits

28

Superseding Information - 2
*United States v. Nilsen*, CR20-151RAJ

from the misappropriated information, including by sharing it within their professional networks.

b.      **Reinstating suspended 3P accounts and products**:  Defendants, and other 3P sellers and consultants, bribed Amazon insiders to reinstate merchant accounts and product listings that Amazon had suspended in response to customer-safety concerns, counterfeiting complaints from intellectual-property holders, the merchants' manipulation of product reviews, and other violations of Amazon's policies and codes of conduct.  Since their baseless and fraudulent reinstatement, the previously suspended merchant and product listings have generated over $100 million dollars in total revenue from sales on the Amazon Marketplace.

c.      **Circumventing Amazon restrictions on 3P accounts**:  Defendant's Co-defendants, and other 3P sellers and consultants, bribed Amazon insiders to circumvent and/or waive Amazon-imposed limitations and fees relating to the amount of inventory, including hazmat inventory, oversized inventory, and long-term inventory, that 3P sellers may store at Amazon's warehouses and fulfillment centers.  The Amazon insiders also helped 3P sellers and consultants defraud Amazon into approving the 3P sellers' requests to sell restricted products, such as dietary supplements, also referred to as "ungating," on the basis of fraudulent and forged supplier invoices.

d.      **Facilitating attacks against 3P sellers and product listings**:  Defendants, and other 3P sellers and consultants, bribed Amazon insiders to attack other 3P sellers and those sellers' product listings, in order to gain an unfair competitive advantage over those victims and to settle other scores.  To facilitate these attacks, Amazon insiders shared competitive intelligence about the victim sellers' businesses, products, and advertising strategies, with 3P sellers and their consultants; used their inside access to Amazon's network to suspend the victim sellers' accounts and product listings; and helped consultants flood the victims' product listings with content and fraudulent customer reviews designed to hurt sales.

Superseding Information - 3
*United States v. Nilsen*, CR20-151RAJ

1    These attacks included self-styled "takedowns" against victim 3P sellers, through

2  which the Defendant's Co-defendants, and other 3P sellers and consultants, adulterated

3  victims' product listings with replacement, and in some cases lewd and offensive, content

4  and images, designed to drive away consumers and intimidate the victims.  Examples of

5  such adulterated product listings are set forth below:



\*\*\*



\*\*\*

Superseding Information - 4
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



The intended and actual impact of such adulteration attacks was to effectively

incapacitate the 3P accounts.

**A.      THE AMAZON MARKETPLACE**

4.      The Amazon Marketplace consists of geographically defined online

marketplaces, including a United States-based marketplace and a United Kingdom-based

marketplace.  Online consumers can browse millions of product listings on the Amazon

Marketplace, place items in virtual shopping carts, complete purchases using credit cards

and/or other forms of digital payment, arrange for products to be delivered to addresses

that they designate, and return products to Amazon in exchange for a refund.  Amazon

provides consumers with a centralized search engine, categorized hyperlinks, online

directories, and other digital tools, in order to navigate the Amazon Marketplace.  Using a

standardized format and organization, every product listing sets forth the relevant

product's attributes, appearance, price, customer reviews, and an Amazon Standard

Identification Number ("ASIN"), an alphanumeric identifier assigned to each product.

5.      Merchants on the Amazon Marketplace consist of Amazon, as well as 3P

sellers.  3P sellers pay Amazon fees in connection with making sales on the Amazon

Superseding Information - 5
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Marketplace.  To facilitate 3P sellers' operations, Amazon offers 3P sellers a range of additional fee-based services, including the "Fulfillment by Amazon" (or "FBA") service, through which Amazon stores inventory for 3P sellers, arranges for that inventory to be shipped to purchasers, and handles customer-service inquiries and returns.  Amazon also assigns employees at its offices around the world to one or more "Seller Support" teams, which assist 3P sellers.

6.     When registering an account with Amazon, 3P sellers provide Amazon with identifying information, which may include an email address, a form of identification that can be used to verify identity, a credit card, and a financial account to which Amazon can transmit sales proceeds.  Products sold by 3P sellers may consist of (a) products that they acquire elsewhere and resell, in potential competition with other 3P sellers who engage in the sale of the same products; and (b) products that they sell under a registered "brand," in connection with a variety of brand-protection programs and services that Amazon may offer.

7.     Amazon restricts the sale of certain categories of products, by requiring 3P sellers to obtain Amazon's approval before selling these items.  Examples of restricted products include copyrighted multimedia, dietary supplements, over-the-counter medicines, and medical products.  3P sellers that seek to sell products in restricted product categories typically provide Amazon with invoices showing that they purchased these items from a bona fide supplier, in order to establish that the products they intend to sell are authentic, and that they are not engaging in retail arbitrage.

8.     Amazon requires 3P sellers to agree to selling policies and codes of conduct as a condition to make sales on the Amazon Marketplace.  Amazon's selling policies and codes of conduct prohibit 3P sellers from providing inaccurate information to consumers, manipulating product reviews, otherwise contacting consumers independently of Amazon, and attacking other 3P sellers and those sellers' product listings.  In practice, a wide range of 3P seller conduct may violate these policies and codes of conduct, including: (a) the sale of unsafe products; (b) the sale of used or refurbished products that

1  are marketed as "new"; (c) the sale of counterfeit products; (d) 3P sellers' infringement of

2  intellectual-property rights in product listings, product packaging, and products; and (e)

3  3P sellers' manipulation of product reviews, including by posing falsely as product

4  purchasers, and offering gifts to consumers in exchange for their agreement favorably to

5  post or revise product reviews.

6        9.     Amazon also maintains, including on computers and servers located in the

7  Western District of Washington, a wide array of information about 3P sellers and their

8  products, including price and sales history, product-review history, the rate at which

9  customers return 3P sellers' products and the reasons that consumers provide for such

10  returns, 3P sellers' timeliness in delivering products to customers and refreshing their

11  inventory of products that Amazon stores at its warehouses, and identifying information

12  regarding customers.  3P sellers have access to some information about their own 3P

13  accounts and products, including product-specific data regarding their revenues over

14  time.  Amazon does not, however, provide 3P sellers with access to non-public merchant-

15  specific and/or product-specific information about other 3P sellers; nor does it provide 3P

16  sellers with the contact information for customers who review their products.

17        10.    Amazon uses algorithms to control the operation of various aspects of the

18  Amazon Marketplace, including, in particular, the Amazon Marketplace's central search

19  engine, the prominence of merchants and product reviews in product listings, limits on 3P

20  sellers' ability to store different types of inventory in Amazon's warehouses, and the

21  potential suspension of 3P accounts or their product listings.  For instance, Amazon's

22  central search engine may rank product listings in response to customer queries, in part

23  by reference to "keywords" that 3P sellers use to designate their product listings.  The

24  "buy box" on a product listing may provide consumers with a default seller who has a

25  long history of positive customer reviews and timely product deliveries.  In addition, the

26  most prominent product review shown on a product listing may be one that is recent,

27  lengthy, and voted "helpful" by other consumers.  Amazon takes reasonable measures to

28  maintain the confidentiality of information about the algorithms and other systems that

Superseding Information - 7
*United States v. Nilsen*, CR20-151RAJ

1  control the Amazon Marketplace, including by restricting access to this information and

2  by marking it confidential, and such information derives independent economic value

3  from its secrecy.

4       11.    Amazon uses "suspensions" to regulate 3P sellers and products on the

5  Amazon Marketplace.  Various teams within Amazon, and the employees and contractors

6  that compose those teams, have the authority to suspend 3P sellers and products for

7  reasons that can include product safety, intellectual-property violations, the sale of

8  restricted products without first obtaining Amazon's preapproval through the use of a

9  legitimate supplier invoice, improper contact with consumers, and review manipulation.

10  Suspensions may be temporary, *e.g.*, in order to provide Amazon time to inspect a

11  product that consumers have identified as unsafe.  Suspensions may also be conditional

12  upon the relevant 3P seller supplying a "plan of action" to Amazon that adequately

13  explains the cause of the conduct that gave rise to the suspension and satisfactory

14  remedial measures.  In certain cases, suspensions may be permanent.  Amazon provides

15  3P sellers the option to appeal from (or "escalate") adverse suspension decisions.

16       12.    Amazon's computer network includes tools that enable authorized

17  employees and contractors to suspend 3P sellers and products, receive and review "plans

18  of action" from suspended 3P sellers, and to revive (or "reinstate") suspended 3P sellers

19  and product listings.  Amazon requires employees and contractors with access privileges

20  to these tools only to use those privileges in furtherance of their job responsibilities, and

21  prohibits them from using those access privileges in furtherance of any private,

22  pecuniary, objective.  Amazon further requires employees and contractors not to provide

23  outsiders with access to the tools that they use in connection with the regulation of 3P

24  sellers and products on the Amazon Marketplace.  Amazon also provides SOPs, Wikis,

25  and other written guidance, to its employees and contractors in connection with their

26  regulation of the Amazon Marketplace.  Amazon takes reasonable measures to maintain

27  the confidentiality of these SOPs, Wikis, and other written guidance, including by

28

Superseding Information - 8
*United States v. Nilsen*, CR20-151RAJ

1  restricting access to this information and by marking it confidential, and such information
2  derives independent economic value from its secrecy.

3       13.      Amazon keeps a record of each 3P seller's suspension and reinstatement
4  activity (and other related information about the merchant's account and product listings)
5  in a running log of annotations, referred to herein as an "annotation history."  Annotation
6  histories may reflect confidential complaints from other 3P sellers and/or customers,
7  details of Amazon's internal investigation regarding the relevant 3P account, a record of
8  account or product suspensions, and a record of account or product reinstatements.
9  Amazon does not make annotation histories available to 3P sellers, and otherwise
10  restricts access to those annotation histories to the employees and contractors whose roles
11  and responsibilities include the regulation of the Amazon Marketplace.

12       14.      The Amazon employees, contractors, and computers that play a role in the
13  processes described in this section are located in the Western District of Washington and
14  elsewhere.

15  **B.      THE DEFENDANTS**

16       15.      Ephraim Rosenberg ("Rosenberg"), also known as ("aka") "Ed Rosenberg,"
17  is a resident of Brooklyn, New York, and the owner of Effyzaz, Inc. ("Effyzaz"), a New
18  York company.  Rosenberg has purported to provide fee-based consulting expertise to 3P
19  sellers, including through a service named "Amazon Sellers Group TG" ("ASGTG").  In
20  addition to providing individualized consulting to 3P sellers, Rosenberg has hosted an
21  annual 3P seller conference in Brooklyn, has provided informational digital videos about
22  3P sales through an account on the video-sharing website www.youtube.com, and has
23  hosted interactive 3P consulting webinars.

24       16.      Joseph Nilsen ("Nilsen") is a resident of New York, New York, and is the
25  founder and Chief Executive Officer ("CEO") of Digital Checkmate, Inc. ("Digital
26  Checkmate"), a New York company.  Nilsen has purported to provide fee-based
27  consulting expertise to 3P sellers, including by advising 3P sellers regarding their online
28  product offerings on the Amazon Marketplace, providing competitive intelligence to 3P

Superseding Information - 9
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  sellers, devising marketing campaigns for 3P sellers, and assisting and/or representing 3P
2  sellers in connection with the suspension of their accounts and product listings.  Nilsen
3  also has made sales on the Amazon Marketplace through numerous 3P accounts in his
4  name, the names of others, and dozens of aliases that he uses in order to conceal his
5  identity and his association with the 3P accounts from Amazon.
6      17.   HADIS NUHANOVIC ("NUHANOVIC") is a resident of Acworth,
7  Georgia, and is the owner of Buddibox, LLC ("Buddibox"), a Georgia company.
8  NUHANOVIC operated a 3P account under the name "Buddibox" between in or around
9  October 2013 and in or around August 2018, when Amazon suspended the account for
10  fraud.  After August 2018, NUHANOVIC continued to operate 3P accounts under
11  various aliases that he used to conceal his identity and his association with the 3P
12  accounts from Amazon.  NUHANOVIC also has offered fee-based consulting services to
13  other 3P sellers.
14      18.   Kristen Leccese ("Leccese") is a resident of New York, New York, and
15  marketed herself as the Vice President of Digital Checkmate.  In conjunction with Nilsen,
16  NUHANOVIC, and others, Leccese assisted in providing consulting services and also has
17  operated numerous 3P accounts on the Amazon Marketplace.
18      19.   Rohit Kadimisetty ("Kadimisetty") is a resident of Northridge, California.
19  Between in or around September 2014 and in or around December 2015, Kadimisetty
20  worked as an Amazon Seller Support Associate in Hyderabad, India.  After on or about
21  January 2017, Kadimisetty lived in California and provided consulting services for 3P
22  sellers.
23      20.   Nishad Kunju ("Kunju"), aka "Tina" and "Jonathan Li," is a resident of
24  Hyderabad, India.  Until his termination in or around August 2018, Kunju worked as an
25  Amazon Seller Support Associate in Hyderabad, India.  In this position, before his
26  termination in or about August 2018, Kunju helped manage the operation of the Amazon
27  Marketplace, and was granted restricted access to tools and files on the Amazon network
28  relevant to his roles and responsibilities.  Such access privileges enabled him to review

Superseding Information - 10
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and download internal Amazon SOPs and Wikis, review and download data regarding 3P sellers and products, enforce suspensions against 3P sellers and products, and reverse certain enforcement actions.  After his August 2018 termination, Kunju performed fee-based consulting for 3P sellers, including through Nilsen, NUHANOVIC, and others known and unknown.

## COUNT 1
### (Conspiracy)

21.     The allegations contained in Paragraphs 1 through 20 of this Superseding Information are re-alleged and incorporated as if fully set forth herein.

**A.     THE OFFENSE**

22.     Beginning at a date unknown, but no later than July 2017, and continuing through September 2020, at Seattle, within the Western District of Washington, and elsewhere, the Defendants, Ephraim Rosenberg, Joseph Nilsen, HADIS NUHANOVIC, Kristen Leccese, Rohit Kadimisetty, and Nishad Kunju, and others known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree together to commit offenses against the United States, to wit:

a.     to use a facility in interstate and foreign commerce, namely, the wires, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, Commercial Bribery, in violation of New York Penal Code Section 180.03, and California Penal Code § 641.3, in violation of Title 18, United States Code, Section 1952(a)(3)(A).

**B.     OBJECTS OF THE CONSPIRACY**

23.     It was an objective of the conspiracy to provide 3P sellers with an illegitimate competitive advantage on the Amazon Marketplace, and to benefit those 3P sellers' financially, by gaining unauthorized access to the systems, processes, and information that regulate the Amazon Marketplace, and using that access baselessly and fraudulently to benefit certain 3P accounts and product listings and to harm other 3P accounts and product listings.

Superseding Information - 11
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

24.     It was an objective of the conspiracy to enhance the marketability and financial success of consulting operations to 3P sellers that relied on recruiting Amazon insiders, providing bribes and promises of bribes to those insiders, and obtaining benefits from those insiders in exchange for bribes and the promise of bribes.

25.     It was an objective of the conspiracy to conceal, protect, and perpetuate the commercial success of 3P sellers and consultants who relied on commercial bribery and unauthorized access to Amazon's protected computer network.

**C.      MANNER AND MEANS OF THE CONSPIRACY**

26.     The manner and means used to accomplish the conspiracy included the following:

a.      It was part of the conspiracy that the Defendants, and others known and unknown to the Grand Jury, collaborated to provide fee-based consulting services to 3P sellers.

b.      It was part of the conspiracy that the Defendants, and others known and unknown, recruited Amazon employees and contractors to accept bribes.  It was further part of the conspiracy that such recruitment relied on information that other Amazon insiders misappropriated from Amazon's protected computer network regarding employees' and contractors' identities, roles, and contact information.  It was further part of the conspiracy that such recruitment targeted employees and contractors with roles, responsibilities, knowledge, and access privileges that would be commercially valuable to the consultants and the consultants' 3P clients, including access to computer systems, tools, processes, and information on Amazon's protected computer network that could help secure an unfair competitive advantage over other 3P sellers.

c.      It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders provided the Defendants, and others known and unknown, with unauthorized access to Amazon protected computers and Amazon files, systems, servers, and computer networks, all of which were used in and affecting interstate or foreign commerce or communication.

Superseding Information - 12
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

d.      It was part of the conspiracy that the Defendants employed a variety of methods designed to conceal their communications, identity, and participation in the scheme.  Such techniques included, but were not limited to, (i) using encrypted messaging platforms, such as WhatsApp, WeChat, Signal, and Telegram; (ii) creating email and other accounts, using aliases, for limited use between compartmentalized participants in the scheme; (iii) using shared cloud-based documents and file storage services; and (iv) communicating through draft and unsent email messages to avoid the transmission of emails that could be traced by law-enforcement agents.

e.      It was part of the conspiracy that, without Amazon's knowledge or consent, the Defendants, and others known and unknown, paid, and offered to pay, bribes to Amazon employees for the purpose of influencing their conduct in relation to their employment, specifically, in order to benefit 3P accounts operated by the members of the conspiracy and their clients, and to cause harm to Amazon.

f.      It was part of the conspiracy that the Defendants, and others known and unknown, transmitted, routed, and received bribes using various means, including but not limited to bulk cash transfers, personal and cashier's checks, standard bank wires, payment processing services like Payoneer, and online remittance and transfer services, such as PayPal, Remitly, Xoom, Transfast, and MoneyGram.

g.      It was part of the conspiracy that the Defendants, and others known and unknown, used aliases, apparently unrelated intermediaries, and false and fraudulent identifiers and information in order to conceal the transmission, routing, and receipt of bribes.  Such concealment included, but was not limited to, Rosenberg's use of a PayPal account registered under the name "Tom Landry," NUHANOVIC's use of a PayPal account under the name "Vinara," registered under his wife's name, and the Amazon insiders' use of Remitly, MoneyGram, and bank accounts registered under the names of their associates and family members.

h.      It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders provided the Defendant's Co-defendants, and others

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  known and unknown, with access devices, including the insiders' credentials and network

2  access privileges, which could be and were indeed used to gain unauthorized access to

3  Amazon protected computers.

4        i.     It was part of the conspiracy that the Defendants marketed to 3P

5  sellers and other consultants their access to Amazon insiders.

6        j.     It was part of the conspiracy that the Defendants referred 3P sellers

7  to each other, to other consultants, to other 3P sellers, and to Amazon insiders, such that

8  the Defendants were mutually interdependent upon each other for continued commercial

9  success.

10        k.     It was part of the conspiracy that, in exchange for bribes and the

11  promise of bribes, Amazon insiders provided consultants and 3P sellers, including the

12  Defendants, with confidential information taken from Amazon's protected computers.

13  The information obtained through these acts of misappropriation included, but was not

14  limited to:

15        i.     SOPs, Wikis, and information regarding Amazon's internal

16  algorithms, systems, and teams;

17        ii.     client 3P account information, including annotations,

18  performance reports, and pending enforcement actions;

19        iii.     competitor 3P account information, including the identity and

20  personal identifiers of account owners and operators, performance data, and disciplinary

21  history;

22        iv.     customer information, including identifying and contact

23  information for consumers/buyers and restricted data regarding customer reviews and

24  complaints on particular 3P accounts;

25        v.     employee information, including contact information and

26  organizational charts for particular groups or teams within Amazon;

27        vi.     enforcement actions and other measures taken by Amazon to

28  regulate and remediate the Amazon Marketplace; and,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1          vii.     suppliers, inventory, sales prices, revenues, profit margins,

2   advertising reports, and other records and information about particular goods and product

3   listings on the Amazon Marketplace, including copies of legitimate invoices from *bona*

4   *fide* suppliers submitted by other 3P sellers in relation to restricted categories.

5          l.      It was part of the conspiracy that, in exchange for bribes and the

6   promise of bribes, Amazon insiders agreed to facilitate the baseless and fraudulent

7   reinstatement of 3P seller accounts and product listings, including by:

8          i.      On behalf of Defendant's Co-defendants, sending one or

9   more commands through Amazon's internal computer network (in a process the

10  conspirators called "flick[ing] the switch"), which resulted in the reinstatement of 3P

11  accounts and product listings, and enabled those 3P accounts and product listings

12  immediately to resume sales on the Amazon Marketplace.

13         ii.     Entering false and fraudulent notes and annotations in

14  Amazon's internal computer network, which caused other Amazon employees and

15  contractors to conclude that reinstatement was required under Amazon's policies.

16         iii.    Assigning affected 3P sellers' plans of action to themselves

17  by instructing the 3P sellers and their representatives to submit plans of action to Amazon

18  at a date and time when an Amazon insider could log into Amazon's computer network

19  and self-assign the project to themselves before any other employee or contractor could

20  do so.  Following such self-assignment, Amazon insiders approved the otherwise

21  fraudulent or inadequate plans of action.  If their access privileges did not permit them to

22  approve the plans of action, the Amazon insiders held such plans of action in abeyance in

23  an effort to identify other Amazon insiders who were willing to approve the plans of

24  action.

25         iv.     Drafting fraudulent plans of action for 3P sellers, which used

26  materially false statements, representations, and omissions, to induce Amazon to reinstate

27  the affected 3P seller accounts and product listings, including by asserting falsely that the

28  3P sellers lacked any knowledge or control of the conduct that had given rise to the

Superseding Information - 15
*United States v. Nilsen*, CR20-151RAJ

1  underlying suspension and/or that one or more employees or contractors of the 3P sellers

2  had committed that conduct without appropriate authority.

3         m.    It was part of the conspiracy that the Defendants, and others known

4  and unknown, used bribes, the promise of bribes, misappropriated information from

5  Amazon's protected computer network, and materially false statements, representations,

6  and omissions, to manipulate the reviews that appeared on product listings on the

7  Amazon Marketplace.  These acts of review manipulation included:

8         i.    Amazon insiders' transmission of commands, on behalf of

9  Defendant's Co-defendants, to Amazon's protected computer network, which resulted in

10  the deletion of negative product reviews from product listings.

11         ii.    Using misappropriated information from Amazon's protected

12  computer network regarding consumers' contact information, in order to induce or

13  intimidate consumers to revise or remove negative product reviews.

14         iii.    Using misappropriated information from Amazon's protected

15  computer network about the operation of Amazon's review-ranking algorithm to engineer

16  reviews to appear legitimate, when in truth and in fact, they were not legitimate.  For

17  instance, the Defendants, and others known and unknown, attempted to trick Amazon's

18  review-ranking algorithm into believing that fraudulent product reviews had been posted

19  by *bona fide* purchasers, including by "aging" buyer accounts through a pattern of

20  fictitious product purchases of an extended duration of time, buying products and

21  directing Amazon to sell them to random residential addresses in an effort to make it look

22  like a real purchase had occurred, using other buyer accounts to rate fictitious reviews as

23  "helpful," and concealing their control over the accounts through the use of digital tools

24  like virtual private networks and virtual machines.  Through this process, the Defendants,

25  and others known and unknown, caused fictitious positive reviews to appear frequently

26  and prominently in beneficiary 3P sellers' products listings and caused fictitious negative

27  product reviews to appear frequently and prominently in victim 3P sellers' product

28  listings.

1          iv.    Using misappropriated information from Amazon's protected

2 computer network, including Amazon's SOPs, to take action designed to induce Amazon

3 into concluding falsely that victim 3P seller accounts had violated Amazon's prohibition

4 against review manipulation, resulting in the baseless and fraudulent suspension of those

5 victim 3P sellers.  More specifically, the Defendants, and others known and unknown,

6 used digital tools fraudulently to make it appear as if accounts controlled by digital

7 devices operating from victim 3P sellers' offices had posted exceedingly positive product

8 reviews on those victim 3P sellers' product listings.

9          n.    It was part of the conspiracy that the Defendants, and others known

10 and unknown, used bribes, the promise of bribes, misappropriated information from

11 Amazon's protected computer network, and materially false statements, representations,

12 and omissions, to attack 3P seller accounts and their product listings, to gain a

13 competitive advantage and to settle scores.

14          o.    It was part of the conspiracy, in exchange for bribes and the promise

15 of bribes, Amazon insiders misappropriated legitimate supplier invoices that 3P sellers

16 submitted to Amazon in furtherance with successful requests to sell restricted product

17 categories on the Amazon Marketplace.  It was further part of the conspiracy that, after

18 obtaining these misappropriated legitimate supplier invoices, the Defendants, and others

19 known and unknown to the Grand Jury, altered the invoices to make it appear as if 3P

20 seller accounts that they owned and controlled, and that their clients owned and

21 controlled, were the counterparties to the sales reflected in those invoices.  It was further

22 part of the conspiracy that the Defendants, and others known and unknown to the Grand

23 Jury, sent the altered invoices to Amazon in order successfully to defraud Amazon into

24 granting 3P seller accounts approval to make sales in restricted product categories.

25          p.    It was part of the conspiracy that, in exchange for bribes and the

26 promise of bribes, Amazon insiders, on behalf of Defendant's Co-defendants, effectively

27 eliminated limits on 3P seller accounts' ability to store hazmat inventory, oversized

28 inventory, and long-term inventory in Amazon's warehouses.

Superseding Information - 17
*United States v. Nilsen*, CR20-151RAJ

q.     It was part of the conspiracy that, in exchange for bribes and the promise of bribes, Amazon insiders, on behalf of Defendant's Co-defendants, erased shipping tracking information from Amazon's computer network, which induced Amazon falsely to conclude that it had not returned certain inventory to 3P sellers, and to reimburse those sellers for inventory that Amazon falsely believed had been lost in transit.

r.     It was part of the conspiracy that Defendants concealed the scheme and the underlying conduct, including the use of complicit insiders, from being discovered by Amazon and others.

s.     It was part of the conspiracy that Defendants secured a commercial advantage and private financial gain, both for themselves and for their clients.  The value of the information misappropriated through their access to protected Amazon networks far exceeded $5,000 in any one year period.

t.     It was part of the conspiracy that Defendants caused economic harm to Amazon, to sellers on the Amazon Marketplace, and to consumers who purchased goods from 3P sellers improperly aided through illicit means described herein.  The economic impact of the scheme was substantial, estimated in excess of $100 million. That economic impact consisted of sales earned by products and 3P sellers following their improper reinstatement, financial harm endured by 3P sellers as a result of attacks against them, and costs to Amazon.

**D.     OVERT ACTS**

27.     In furtherance of the conspiracy, and to achieve the objects thereof, the Defendants, and others known and unknown to the Grand Jury, did commit, and cause to be committed, the following overt acts, within the Western District of Washington and elsewhere.

28.     Dating back to at least 2017, members of the conspiracy collaborated, conspired, and aided and abetted one another, and others, to provide a variety of services to manipulate the Amazon Marketplace and to confer benefits and advantages to certain

3P accounts, through use of insiders and unauthorized access to protected computers and the confidential data and information stored thereon.  Such conduct involved, but was not limited to, the following representative acts:

      a.    On or about January 13, 2018, Nilsen sent Rosenberg an email discussing the cost of certain account suspension reinstatements, which included an amount purportedly for the Amazon insiders plus a surcharge for Rosenberg and Nilsen. For instance, Nilsen stated: "They want 5.5k for any Jeff B Final Word reinstatement and I am being honest with you which I hope you respect I think it is fair to tack on 1k – so the reinstatements would be 6.5k.  Regarding timeframe, they aren't going to commit to any times.  They work very fast, though."

      b.    On or about February 5, 2018, Nilsen sent an email to Rosenberg instructing Rosenberg to submit a plan of action seeking reinstatement related to a 3P account at a particular time, so that one of Nilsen's "guys" at Amazon could assign the plan of action to himself.

      c.    On or about February 6, 2018, Nilsen sent Rosenberg an email stating: "Alright… I wouldn't tell your boy that it's going to be reinstated right away so he's not disappointed if my guys has a natural delay … but between me and you, very good chance response will come back by 12:45A."  Later the same date, at approximately 12:50 a.m. ET, Nilsen sent Rosenberg an email stating "It's done."  In a subsequent email, Nilsen stated, "Let me pay the guy first thing tomorrow – let it reach him – and then run more accounts by him."

      d.    On or about February 6, 2018, a bank account registered to Rosenberg's company Effyzaz wired $9,730 to a bank account registered to Nilsen's company Digital Checkmate.

      e.    On or about February 14, 2018, Rosenberg sent Nilsen an email stating that Rosenberg's accumulated tab with Nilsen was "7700 total," which included "1200" for "fruit," a term Rosenberg used to describe annotation histories

1   misappropriated from Amazon's network, and additional amounts for other services, such
2   as the fraudulent increases in hazmat storage limits for a 3P account.

3   　　　　f.　　On or about February 15, 2018, Rosenberg sent Nilsen and Leccese
4   a suitcase containing approximately $8,000 in cash, through the ride-sharing application
5   Uber.

6   　　　　g.　　On or about March 5, 2018, Rosenberg sent Nilsen an email
7   requesting the alteration of internal Amazon records for a 3P account, stating: "is there a
8   way to have this case deleted 4910461581?"  Nilsen responded to Rosenberg by email
9   affirmatively, stating: "They will make this go away – case w/ associated email will be
10   gone from case log.  2k confirmed right they are about to handle it."

11   　　　　h.　　On or about March 22, 2018, Nilsen sent Rosenberg an email stating
12   that the task of resetting a 3P account's hazmat storage quotas "will be done in 15
13   minutes – one of the guys with the tool starts at 1 est he'll bang it out as soon as he gets
14   in."

15   　　　　i.　　On or about June 26, 2018, Nilsen sent an email to Rosenberg
16   bearing the subject line "Two-Fer Tuesdays – Exclusive Deal for Mr. Ed Rosenberg."  In
17   the email, Nilsen explained that "a bunch of friends" were covering for others in a
18   particular Amazon department and would be able to expedite certain suspension
19   reinstatements.  Nilsen described the opportunity as follows:  "This is like a lightning
20   deal on crack. . .  To be clear, this is Kobe laying it up and Shaque [*sic*] coming in to
21   crush the backboard.  If approved, all cases will be slammed [*sic*] dunk."

22   　　　　j.　　On or about November 2, 2018, another consultant, also based in
23   New York, with whom the Defendant's Co-defendants frequently collaborated
24   ("Consultant-1"), sent Nilsen a WhatsApp message requesting the "customer contact info
25   for 500 ppl that left negative reviews" on a particular 3P account listing, noting "he is
26   willing to pay big bucks. You interested in it ?"  Consultant-1 further shared a link to the
27   3P seller's product listing and explained that the requested confidential Amazon customer

28

Superseding Information - 20
*United States v. Nilsen*, CR20-151RAJ

1  information would be used by the 3P account operator to attempt to "remove negative

2  reviews."

3        k.        On or about November 14, 2018, Consultant-1 sent Nilsen a

4  WhatsApp message requesting internal Amazon information regarding a particular

5  product listing suspended by Amazon as an "unapproved medical device."  In response,

6  Nilsen sent multiple photographs of a computer monitor displaying internal Amazon files

7  regarding the particular suspension action.

8                **Examples of Misappropriation of Internal Files and Information**

9        29.      In furtherance of the course of this conspiracy, members of the conspiracy

10  misappropriated, shared, and disseminated internal confidential and propriety records and

11  information from protected computers on Amazon networks.  This misappropriation,

12  through unauthorized access to Amazon's protected computers, involved, but was not

13  limited to, the following representative acts:

14        a.        On or about February 4, 2019, an Amazon insider logged into

15  Amazon's confidential internal Wiki database under his Amazon username.  The insider

16  downloaded an HTML page from Amazon's confidential internal Wiki database.  The

17  document, which was marked "Amazon Confidential," described an internal Amazon

18  algorithm and formula to determine how product reviews are placed vis-à-vis other

19  product reviews.  Later the same date, the insider sent an email to Nilsen and Kunju

20  attaching the misappropriated Wiki page, along with other confidential internal files

21  misappropriated from Amazon's computer network.

22        b.        On or about February 4, 2019, Nilsen sent an email to a 3P seller for

23  whom the Defendant's Co-defendants provided repeated services ("Client-2") attaching a

24  PDF file containing the misappropriated data that the Amazon insider had sent to Nilsen

25  and Kunju earlier that same day.  Nilsen's email to Client-2 bore the subject line "Please

26  do not give to the cool kids/made men – they do not deserve this."  The stolen Amazon

27  information was contained in an attachment bearing the file name "Soccer Schedule.pdf."

28

Superseding Information - 21
*United States v.Nilsen*, CR20-151RAJ

1   Later the same date, Client-2 sent Nilsen a Facebook message, stating:  "You are a

2   freaking magician.  Will you please coach my kids soccer team?"

3               c.        On or about February 21, 2019, Nilsen emailed Rosenberg a

4   hyperlink to an encrypted PDF containing the misappropriated data that an Amazon

5   insider emailed to Nilsen earlier that day.  Rosenberg responded to Nilsen, stating: "wow

6   – cool" and "how much I owe you?"  Nilsen responded, stating "they are doing 175 per

7   … 350."

8               d.        On or about February 21, 2019, Rosenberg sent $350 to Nilsen over

9   the online payment service, PayPal.

10              e.        On or about February 23, 2019, a Remitly account registered to

11  Leccese transferred $2,500 to an India bank account registered to a third-party, which

12  included amounts payable to the Amazon insider.  In a WhatsApp chat, Nilsen and

13  Leccese discussed sending funds to a "soldier" through this bank account.  Leccese

14  agreed to execute the transfer.

**Examples of Reinstatements**

16        30.    **Client-1:**  On multiple occasions, members of the conspiracy collaborated

17  on reinstatements, attacks, and other services for a 3P seller ("Client-1").  For instance, in

18  June 2018, members of the conspiracy obtained the reinstatement of Client-1's account,

19  which had been suspended for review manipulation.  This reinstatement involved, but

20  was not limited to, the following representative acts:

21              a.        On or about June 6, 2018, an insider sent NUHANOVIC a

22  WhatsApp message conveying internal Amazon information and documents regarding

23  Amazon's enforcement actions.  Later, on or about June 13, 2018, NUHANOVIC sent

24  $3,700 to that insider through MoneyGram.

25              b.        On or about June 9, 2018, Nilsen sent Kunju a WhatsApp message

26  agreeing to pay Kunju "2/3" of the fee paid by Client-1 for the reinstatement of its

27  suspended 3P account.  The following day, Kunju confirmed that he "pinged someone

28  [about Client-1's reinstatement] bro.. he said he's looking into it."

1    c.  On or about June 12, 2018, Client-1 submitted to Amazon a plan of

2 action containing knowingly false and fraudulent representations, which Nilsen, Leccese,

3 Kunju, and others, prepared on its behalf.  Among other things, the plan of action

4 represented that the 3P account had utilized a "third-party early reviewer program" that

5 caused the violation of Amazon policies.

6    d.  On or about June 25, 2018, Kunju sent a WhatsApp message to

7 Nilsen regarding Client-1, stating: "I'll get that done today bro … Today people shud be

8 online."  Later the same date, Amazon reinstated Client-1's 3P account.

9   31.  In early December 2018, Amazon suspended Client-1's 3P account again

10 for suspected account manipulation.  In December 2018 and January 2019, members of

11 the conspiracy collaborated to obtain the reinstatement of Client-1's 3P seller account,

12 once again using illicit means.  Client-1 agreed to pay, and did pay, the Defendants a total

13 of $200,000, in exchange for successful account reinstatement.  In order to achieve the

14 reinstatement, the Defendants accessed and obtained internal information about

15 Amazon's suspension determination regarding Client-1 and, using such information,

16 advised and assisted Client-1 in preparing reinstatement requests (plans of action), which

17 included materially false statements.  Through Amazon insiders, the Defendants tracked

18 and managed the progress of Client-1's appeal.  This reinstatement involved, but was not

19 limited to, the following representative acts:

20    a.  On or about December 9, 2018, Kunju sent Nilsen a WhatsApp

21 message conveying information about Client-1's account, including account annotations,

22 that an insider had misappropriated from Amazon's protected network.

23    b.  On or about December 10, 2018, Nilsen emailed NUHANOVIC a

24 draft plan of action prepared on Client-1's behalf, which contained knowingly false

25 statements.  Nilsen and NUHANOVIC further discussed aspects of the plan of action that

26 were "made up."  Later the same day, NUHANOVIC and Client-1's principal discussed

27 payment of $200,000 in exchange for the successful reinstatement of Client-1's account.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 For instance, Client-1's principal stated to NUHANOVIC in a WeChat message: "Tell
2 them, we will do 200k."

3         c.     On or about December 18, 2018, Nilsen and NUHANOVIC
4 discussed over WhatsApp the status of Client-1's reinstatement.  For instance, Nilsen
5 explained that one of his contacts had "tucked it [the pending plan of action] away" until
6 they could "find the right person to reinstate" the account.

7         d.     On or about December 28, 2018, Nilsen and representatives of
8 Client-1 participated in a teleconference with members of Amazon's seller support team
9 in Seattle, Washington, regarding Client-1's suspension.

10         e.     On or about January 8, 2019, Rosenberg contacted one or more
11 Amazon employees regarding Client-1's suspension.  For instance, in an email sent to an
12 Amazon employee located in Seattle, Washington, Rosenberg included various
13 representations regarding Client-1 and a link to a video, which he created, of Client-1's
14 representative, which contained false statements.

15         f.     On or about January 9, 2019, Nilsen informed a representative of
16 Client-1 that Client-1's account would be reinstated, stating, among other things:  "Please
17 don't tell people this … Your account manager or somebody hears that you knew that
18 you were getting reinstated and she could really screw you."  Later that same day,
19 Amazon reinstated Client-1's 3P account.

20         g.     On or about January 9, 2019, Client-1's agent sent Nilsen a WeChat
21 message stating: "rather transfer not happening in usa," "better in Hongkong or India.  U
22 know what I mean.  Cash is too much very risky move too."

23         h.     On or about January 9, 2019, a bank account registered to Client-1
24 wired $55,000 to a bank account registered to NUHANOVIC.  Later the same date, the
25 bank account registered to NUHANOVIC transferred $55,000 to a bank account
26 registered to Rosenberg's company, Effyzaz.

27         i.     On or about January 11, 2019, Nilsen and NUHANOVIC discussed
28 Client-1's reinstatement over WhatsApp, with Nilsen stating "That account was fucked

1   beyond fucked … does he know how lucky he is that his Asian partner got in touch with

2   some guy in atl who got in touch with some guy in ny who got in touch with some

3   [redacted] out of Brooklyn who got in touch with somebody high up and paid them off to

4   save his account."

5           j.      On or about January 12, 2019, a Hong Kong bank account controlled

6   by Client-1 wired $145,000 to a Hong Kong bank account controlled by NUHANOVIC's

7   associate.

8           k.      On or about January 18, 2019, a Hong Kong bank account controlled

9   by NUHANOVIC's associate made two fund transfers, namely, (i) $71,460 to a bank

10  account registered to NUHANOVIC's company, Buddibox, and (ii) $71,460 to a bank

11  account registered to Nilsen's company, Digital Checkmate.

12          l.      On or about January 18, 2019, a Remitly account registered to

13  Leccese transferred $2,900 to an India bank account registered to Kunju.

14      32.     **Client-2:**  On multiple occasions, Defendant's Co-defendants collaborated

15  on reinstatements and other services for a 3P seller (Client-2), whose seller accounts had

16  been suspended for various violations of Amazon policies.  These reinstatements

17  involved, but were not limited to, the following representative acts:

18          a.      On or about July 28, 2018, Client-2 sent a Facebook message to

19  Nilsen regarding Amazon's suspension of a dietary-supplement product on Client-2's

20  primary 3P seller account for product compliance reasons.

21          b.      On or about July 29, 2018, Kunju sent Nilsen a WhatsApp

22  messaging confirming that he would assist with reinstatement, stating "I am in bro.  Let's

23  make some money."  Later the same date, Kunju sent a command from his Amazon

24  workstation to Amazon's protected computer network, which resulted in the

25  reinstatement of Client-2's 3P account's suspended product listing.

26          c.      On or about February 24, 2019, Client-2 sent Nilsen a Facebook

27  message, stating "Another urgent situation ☹.  My BEST SELLER just went down."

28  Later the same date, Nilsen responded "reinstated bro," attaching a screenshot of a chat

Superseding Information - 25
*United States v. Nilsen*, CR20-151RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

between Nilsen and an insider, which contained a photograph of a computer logged into Amazon's protected computer network.

        d.     On or about February 24, 2019, Client-2 sent Nilsen a Facebook message, stating: "Wowow.  That was a record.  PayPal address please ☺  I would like to tip, please tell me appropriate amount.  I think it's only right."  Nilsen responded to Client-2, stating: "I have to pay this guy $500."

        e.     On or about February 24, 2019, Client-2 sent $500 to Nilsen over the online payment service, PayPal.

    33.    **Client-3:**  On multiple occasions, Defendant's Co-defendants collaborated on reinstatements and other services related to a 3P seller ("Client-3"), who was referred to Nilsen by Client-2.  These services involved, but were not limited to, the following representative acts:

        a.     On or about March 10, 2019, Client-2 contacted Nilsen over Facebook about assisting Client-3 with a product listing suspended by Amazon for suspected fraud.  Later that same date, Nilsen responded with internal information, obtained from an insider, about Client-3's 3P account and the suspension action from an insider, confirming that "soldiers" were assisting and further stating: "[s]trong blocked … sucks … one of them said they need 5 minutes and they will be able to either reinstate it or let me know that it will take 2-3 days."  Later the same date, Nilsen sent Client-2 a Facebook message containing photographs of Client-3's reinstated 3P account and account information from Amazon's internal systems, along with the note: "Done bro…reinstated…bammmmm."

        b.     On or about March 11, 2019, Client-3 sent Nilsen a Facebook message expressing appreciation for the product listing reinstatement and discussing future business together.

        c.     On or about May 22, 2019, Client-3 sent Nilsen a message over Facebook requesting assistance in the suspension of a product listing on his 3P account because of customer complaints, stating: "our top seller our collagen was removed from

1  our store, it's live under our second account so we didn't know what the hell was going
2  on."

3          d.      On or about May 23, 2019, Nilsen sent Client-3 a Facebook message
4  about the suspension after consulting with an Amazon insider addressing the need for
5  payment.  For instance, Nilsen stated: "what he is saying when he says 'it's risky' is 'This
6  case is too reckless for me to resolved [*sic*] without getting paid.'  Just being straight up
7  with you – my advice – offer him funds & have him resolve it."

8          e.      On or about May 23, 2019, an insider sent a command from his
9  Amazon workstation, resulting in the reinstatement of Client-3's suspended product
10  listing.  Later the same date, Nilsen sent a Facebook message to Client-3 requesting
11  payment of $1,000 for the reinstatement.

12          f.      On or about May 23, 2019, Client-3 wired $1,000 to a bank account
13  registered to Nilsen's company, Digital Checkmate.

14          g.      On or about May 24, 2019, Kunju sent multiple separate wire
15  transfers to the insider.

16          h.      On or about May 25, 2019, Kunju sent Nilsen a WhatsApp message
17  stating: "Were u able to send those funds back? … Soldier wanted funds so I gave to him.
18  He thought the last 2k was received."  On the same date, a Remitly account registered to
19  Leccese attempted to transfer $1,000 to an India bank account registered to Kunju.

20      34.      **Client-4:**  On multiple occasions, Defendant's Co-defendants collaborated
21  on reinstatements, attacks, and other services for a 3P seller account ("Client-4").  For
22  instance, in January 2019, they collaborated on a reinstatement of Client-4's product
23  listing, which Amazon had suspended based on product safety concerns.  This
24  reinstatement involved, but was not limited to, the following representative acts:

25          a.      On or about January 7, 2019, Consultant-1 sent Nilsen a WhatsApp
26  message about assisting in the reinstatement of Client-4's product listing, a hair
27  straightener suspended for product safety issues, inquiring whether Nilsen had "someone
28  that can flip the switch" on the suspended product.  Later the same date, Nilsen sent a

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

WhatsApp message to Kunju asking him to "look into" Client-4's product suspended for a "[s]afety warning or some shit."  Kunju responded affirmatively, stating: "Whatever it is we will get it sorted."

　　　　b.　　On or about January 14, 2019, Kunju informed Nilsen over WhatsApp that an insider had reinstated the suspended product.

　　　　c.　　On or about January 15, 2019, Consultant-1, through his company's account, issued approximately 13 separate checks in varying amounts, totaling over $2,000, to Nilsen's company Digital Checkmate.

　　　　d.　　On or about January 18, 2019, and on January 26, 2019, a Remitly account registered to Leccese transferred $2,900 and $2,800, respectively, to an India bank account registered to Kunju.

　　　　e.　　On or about February 1, 2019, and on or about February 2, 2019, Kunju made multiple wire transfers to the insider.

### Examples of Account Sabotage and Attacks

35.　　**Victim-1:**  At the request of their client, Client-1, members of the conspiracy collaborated on multiple attacks on a competing 3P seller ("Victim-1") on the Amazon Marketplace.  For instance, in June 2018, Client-1 offered to pay $35,000 in cash to "wipe out" Victim-1's 3P account.  Through illicit conduct, members of the conspiracy induced Amazon to suspend Victim-1's seller account, thus depriving Victim-1 of revenue, for a period of approximately a week.  This attack involved, but was not limited to, the following representative acts:

　　　　a.　　On or about June 5, 2018, Client-1 asked NUHANOVIC to coordinate an attack against Victim-1, a 3P seller that competed against Client-1 on the Amazon Marketplace.  NUHANOVIC later requested and obtained through an Amazon insider confidential information about Victim-1 misappropriated from Amazon's protected computer network.

　　　　b.　　On or about June 11, 2018, Nilsen, directly or indirectly, registered the internet domain name "globebrandlawgroup.com."  The same date, Nilsen and Kunju

1   discussed in WhatsApp messages the coordinated plan to "wipe out" Victim-1's 3P

2   account.

3           c.      On or about June 13, 2018, Nilsen submitted a complaint to

4   Amazon, in which he posed as a purported member of the "Globe Brand Law Group" and

5   provided the email address BChambers@globebrandlaw.group.  In the complaint, Nilsen

6   alleged that Victim-1 had infringed upon intellectual property rights licensed to "Globe

7   Brand Law Group" by a multinational technology provider.  Later that same date,

8   Amazon suspended Victim-1's 3P account.

9       36.     **Victim-2:**  In December 2018, members of the conspiracy collaborated on

10  and executed an attack on a 3P seller ("Victim-2"), at the request of Consultant-1.

11  According to Consultant-1, Victim-2 was a client that had failed to pay for Consultant-1's

12  services, and Consultant-1 wanted to send Victim-2 and other clients a clear message.

13  Nilsen defaced Victim-2's seller page with vulgar images, effectively incapacitating it on

14  the Amazon Marketplace.  This attack involved, but was not limited to, the following

15  representative acts:

16          a.      On or about December 27, 2018, Consultant-1 sent Nilsen a

17  WhatsApp message with the Amazon merchant identification number for Victim-2, along

18  with the note "hey got a client refusing to pay can you push masks up on the main images

19  there?"  The reference to "masks" alluded to prior defacement attacks involving images

20  of the Guy Fawkes mask.

21          b.      On or about December 30, 2018, Nilsen and Kunju communicated

22  and collaborated over WhatsApp about the planned attack on Victim-2, including

23  regarding what replacement images to use.

24          c.      On or about December 31, 2018, Nilsen, directly or indirectly,

25  uploaded a "flat file" to Amazon's protected computer network, resulting in the

26  modification of Victim-2's product listing to replace the product images with lewd

27  images, including a smiley face with a raised middle finger, displayed above.

28

Superseding Information - 29
*United States v. Nilsen*, CR20-151RAJ

1        d.     On or about December 31, 2018, Nilsen sent Consultant-1 a

2 WhatsApp message, stating: "Who's got your back? *NO PAY – NO PLAY* I left him

3 one ASIN as a nice F U," along with s screenshot of Victim-2's defaced product listing.

4 Consultant-1 responded, "damn this guy is freaking out. I keep on telling him there is

5 nothing i can do this is the collection agency."

6        e.     On or about December 31, 2018, Nilsen sent Kunju a WhatsApp

7 message requesting that an Amazon insider restore Victim-2's account to its original

8 form, which Kunju agreed to accomplish once the "soldier" was available.

9    37.    **Victim-3:**  At the request of Client-4, members of the conspiracy

10 collaborated on one or more attacks on a competing 3P seller ("Victim-3") on the

11 Amazon Marketplace.  For instance, from in or about December 2018 through at least

12 February 2019, the Defendants employed a variety of techniques, including use of

13 internal Amazon information, to successfully obtain the suspension of multiple product

14 listings and in an effort to takedown Victim-3's account entirely.  Consultant-1, on behalf

15 of Client-4, and Nilsen arranged the attack on Victim-3.  The attack involved, but was not

16 limited to, the following representative acts:

17        a.     On or about December 19, 2018, an Amazon insider emailed Kunju

18 and Nilsen internal information regarding Victim-3's account obtained from Amazon's

19 protected computer network.  Later the same date, Nilsen sent the information regarding

20 VICTIM-3 received from the Amazon insider to Consultant-1 over WhatsApp.

21        b.     On or about December 26, 2018, a bank account registered to

22 Consultant-1's company wired $25,000 to a bank account registered to Nilsen's Digital

23 Checkmate bank account.

24        c.     On or about January 31, 2019, Nilsen, Leccese, and Kunju joined a

25 WhatsApp group chat named "Takedown," which they used to discuss Victim -3 and the

26 ongoing efforts to attack this 3P account.  Among other things, they discussed using sham

27 buyer accounts, registered in others' names or aliases, to purchase goods from Victim-3

28 and submit negative customer feedback and fraudulent complaints.  The participants

Superseding Information - 30
*United States v. Nilsen*, CR20-151RAJ

1  agreed to initially target particular product listings and considered wording of negative

2  reviews that would trigger a product suspension.

3         d.     On or about February 12, 2019, after Amazon had suspended one or

4  more product listings on Victim-3's 3P account based on reports of fraud, Nilsen and

5  Consultant-1 exchanged WhatsApp messages regarding this suspension and the ongoing

6  attack on Victim-3.

7         e.     On or about February 16, 2019, in a WeChat chat, Nilsen solicited

8  further assistance of another consultant, located outside the United States, with whom the

9  Defendants often collaborated ("Consultant-2"), who agreed to assist in the ongoing

10  attack on Victim-3 in exchange for $5,000.  Nilsen later confirmed the $5,000 fund

11  transfer, attaching a screenshot of the wire receipt.

12         f.     On or about February 21, 2019, Nilsen and Consultant-1 discussed

13  additional product suspensions recently imposed on Victim-3 account.

14        All in violation of Title 18, United States Code, Section 371.

15  ## COUNT 2
16  ### (Filing a False Tax Return)

17        On or about May 20, 2019, the defendant HADIS NUHANOVIC did willfully

18  make and subscribe a Form 1120S, U.S. Income Tax Return for an S Corporation, for the

19  defendant's company BuddiBox LLC, which was verified by a written declaration that it

20  was made under the penalties of perjury and which he did not believe to be true and

21  correct as to every material matter.  That document, which HADIS NUHANOVIC signed

22  and filed with the Internal Revenue Service, stated gross receipts (Form 1120s, Line 1)

23  for BuddiBox LLC of $826,510.00, although HADIS NUHANOVIC knew that

24  BuddiBox LLC had gross receipts of at least approximately $1,446,560.46, an amount

25  that should have flowed through to the Defendant's personal return Form 1040 U.S.

26  Individual Income Tax Return.

27        All in violation of Title 26, United States Code, Section 7206(1).

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **FORFEITURE ALLEGATION**

38.     All of the allegations contained in this Superseding Information are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.

39.     Upon conviction of the offense charged in Count 1, HADIS NUHANOVIC shall forfeit to the United States any property constituting, or derived from, proceeds Defendant obtained directly or directly, as a result of the offense.  All such property is forfeitable pursuant to pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), and includes but is not limited to a sum of money in the amount of $100,000 reflecting the proceeds Defendant obtained from the offense.

40.     **Substitute Assets.** If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or,

        e.     has been commingled with other property which cannot be divided without difficulty,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    it is the intent of the United States to seek the forfeiture of any other property of the

2    defendant, up to the value of the above-described forfeitable property, pursuant to

3    Title 21, United States Code, Section 853(p).

4

5        DATED this 27th day of September, 2022.

6

7

8                                                    _____

9                                                    NICHOLAS W. BROWN
                                                     United States Attorney

10

11

12                                                   _____

13                                                   ANDREW C. FRIEDMAN
                                                     Assistant United States Attorney

14

15                                                   _____

16                                                   NICHOLAS MANHEIM
                                                     Assistant United States Attorney

17

18

19

20

21

22

23

24

25

26

27

28

Superseding Information - 33
*United States v. Nilsen*, CR20-151RAJ